IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MINNIE L. KASPER                                                                                         PLAINTIFF

    V.                              Civil No. 2:24-cv-02044-TLB-MEF

MARTIN O'MALLEY, Commissioner,
Social Security Administration                                                                      DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Minnie Kasper, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

### I.      Procedural Background

Plaintiff filed her application for DIB on May 25, 2021[1], alleging an onset date ("AOD") of August 29, 2020, due to fibromyalgia, migraines, poor balance, and ringing in the ears.  (ECF No. 8, pp. 24, 248-253, 282, 317-319, 320-322, 345-347, 351-353).  The Commissioner denied her applications initially and on reconsideration, and an administrative hearing was held before Administrative Law Judge ("ALJ") Harold Davis on February 22, 2023.  (*Id*. at 46-68).  The Plaintiff was telephonically present for the hearing and represented by counsel.

---

[1] Plaintiff filed a prior application for DIB on December 4, 2017.  (ECF No. 8, p. 72).  Judge Elisabeth McGee entered a final, unfavorable decision on August 28, 2020.  (*Id*. at 72-87).

On her alleged onset date, Plaintiff was 49 years old and possessed a GED. (ECF No. 8, pp. 35, 283, 488, 573). She had past relevant work ("PRW") experience as a tractor-trailer truck driver, commercial cleaner, and security guard. (*Id*. at 283-284, 291, 302-308).

In an unfavorable decision dated March 22, 2023, ALJ Davis concluded that the Plaintiff's degenerative disk disease ("DDD"), osteoarthritis ("OA"), fibromyalgia, and anxiety/depression were severe but did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 between August 29, 2020, her alleged onset date, and December 31, 2022, her date last insured. (ECF No.8, pp. 24-25). Despite her impairments, the ALJ determined Plaintiff retained the residual functional capacity ("RFC") to perform light work involving only simple tasks, no detailed or complex instructions, and incidental contact with the public. (*Id*. at 27). Based on the testimony of a vocational expert ("VE"), the ALJ determined Plaintiff could perform work as a housekeeper/cleaner, price marker, and small product assembler. (*Id*. at 36).

On February 9, 2024, the Appeals Council denied Plaintiff's request for review (ECF No. 8, pp. 7-10), and she subsequently filed her Complaint (ECF No. 2) to initiate this action. Both parties have filed appeal briefs (ECF Nos. 10, 12), and the matter is ripe for resolution. The case has been referred to the undersigned for Report and Recommendation.

## II.   Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v.*

*Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record to support the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing PRW; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder will only consider

3

Plaintiff's age, education, and work experience in the light of her RFC if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### III.   Discussion

Plaintiff raises four issues on appeal: (1) whether the ALJ fully and fairly developed the record; (2) whether the ALJ erred at Step Two of the sequential analysis; (3) whether the ALJ's RFC determination is supported by substantial evidence; and (4) whether the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT"). Following a thorough review of the record, the undersigned does not find substantial evidence to support the ALJ's RFC determination.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain must be factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

While we are cognizant of the fact that Plaintiff's date last insured was December 31, 2022, the ALJ's decision fails to take into consideration medical evidence dated after August 2022. (ECF No. 8, p. 32). Evidence dated after a Plaintiff's date last insured should be considered when it has

4

bearing on the severity of their condition during the relevant period. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (finding that evidence dated outside the insured period can be used to help "elucidate a medical condition during the time for which benefits might be rewarded."). Therefore, some of the post-dated evidence presented by the Plaintiff should have been evaluated by the ALJ.

After concluding Plaintiff's fibromyalgia, migraines, poor balance, and ringing in the ears were severe impairments, the ALJ found her capable of performing light work with simple tasks, no detailed or complex instructions, and only incidental contact with the public. In his opinion, the ALJ insists that this restriction to light work was sufficient to "prevent exacerbation of joint and muscular pain and also to acknowledge any ongoing subjective balance complaints." (ECF No. 8, p. 33). We disagree.

Plaintiff quit work in 2018 due to generalized body pain. (ECF No. 8, pp. 481-496, 500-515; ECF No. 8-1, pp. 479-490). Longitudinal records show a history of arthralgia, chest pain, dyspnea, fatigue, and fibromyalgia or somatoform disorder dating back to at least 2017. (ECF No. 8, pp. 337-344, 665-672, 706-710; ECF No. 8-1, pp. 179-195, 414-417, 427-428, 635-637, 645-647, 650-652, 657-658, 662-664, 669-677, 713-736). A rheumatology evaluation with Dr. Lisa Lowery in December 2018 documented severe pain in the hips and cervical, thoracic, and lumbar spine, as well as moderate pain in the hands and feet. (ECF No. 8-1, pp. 420-423, 444-447, 679-695). X-rays showed minimal retrolisthesis of the C5 on the C6 vertebra; mild disc space narrowing at the C4-5 and C5-6 levels; and mild foraminal narrowing on the right at the C5-6 level and on the left at the C3-4 and C5-6 levels. Dr. Lowery diagnosed chronic myalgia and degenerative disk disease ("DDD"). Because her primary care physician ("PCP") had diagnosed

fibromyalgia, which was a possibility given her negative lab work-up and symptomology, Dr. Lowery provided the Plaintiff with a pamphlet discussing this impairment.

An MRI of Plaintiff's cervical spine conducted in March 2019 revealed a mild disk protrusion at the C4-5 level and spinal stenosis at the C5-6 level. (ECF No. 8-1, pp. 418, 520). And nerve conduction studies noted sensory neuropathy in all extremities with mild nonspecific changes in the peroneal motor nerves bilaterally, which could signal early motor neuropathy involving the lower extremities. (*Id*. at 172-173, 217-218, 315-318).

In August 2019, Plaintiff's PCP, Dr. Robert Noonan, diagnosed her with myalgia/myositis of unknown etiology, but probable for fibromyalgia and spinal stenosis after reviewing her MRI and documenting tenderness in the cervical spine with a limited and painful ROM. (ECF No. 8-1, pp. 402-404). He stated that her fibromyalgia symptoms were "very debilitating."

The following month, neurologist, Dr. Timothy Booker, documented an unremarkable metabolic assessment for neuropathy, including a sensorimotor neuropathy panel. (ECF No. 8, pp. 442-447, 452-453, 711-718; ECF No. 8-1, pp. 141-146, 307-315). Accordingly, he diagnosed generalized diffuse pain syndrome with subjective weakness consistent with a prior diagnosis of fibromyalgia; sensory neuropathy in the upper and lower extremities of unknown etiology with negative testing for underlying muscle disease; balance problems with no significant findings of focal motor weakness; and cerebellar or extrapyramidal dysfunction. Dr. Booker advised the Plaintiff to continue with pain management, and indicated she would be considered for gait/balance therapy.

In January 2020, neurologist, Dr. Sukanthi Kovvuru, documented reduced sensation distally in Plaintiff's legs, suggestive of length dependent polyneuropathy of unclear etiology. (ECF No. 8, pp. 595-608, 761-764; ECF No. 8-1, pp. 589-602). Because her previous work-up

was negative, the doctor opted to evaluate Plaintiff for other treatable causes of neuropathy. To begin, Dr. Kovvuru ordered a second nerve conduction study to evaluate the type and severity of her neuropathy. However, testing revealed no electrodiagnostic evidence of a large fiber peripheral neuropathy in her lower extremities, providing further evidence of a fibromyalgia-like disorder. (ECF No. 8, pp. 585-593, 759-760; ECF No. 8-1, pp. 579-587).

On May 27, Dr. Sarah Woodruff prescribed Savella to treat Plaintiff's fibromyalgia and referred her back to rheumatology. (ECF No. 8, pp. 655-656, ECF No. 8-1, pp. 37-38). However, Plaintiff's insurance denied coverage for the Savella. (ECF No. 8, pp. 654-655, ECF No. 8-1, pp. 35-36). In September, the doctor noted Plaintiff had been switched to Amitriptyline. Unfortunately, the Amitriptyline caused hypersomnia, dry mouth, and headaches.

The following month, rheumatologist, Dr. Seth Berney, evaluated Plaintiff's complaints of pain in her ankles, shoulders, and on the soles of her feet. (ECF No. 8, pp. 550-569, 675-702, 747-750). After performing lab tests and reviewing her records, he concluded she was not suffering from an autoimmune or inflammatory rheumatologic disease. Dr. Berney recommended a referral to physical and occupational therapy for vigorous muscle strengthening and stretching exercises; Naproxen and Acetaminophen for pain control; and consideration of an SSRI or SNRI such as Duloxetine. He then deferred treatment to Plaintiff's PCP, stating that Tramadol and Lyrica could be added to control pain and counter medication side effects. This ultimately prompted Dr. Woodruff to refer the Plaintiff to pain management for a diagnosis of chronic pain syndrome. (ECF No. 8, pp. 652-653, ECF No. 8-1, pp. 32-34, 85-87).

Dr. Jennifer Gess conducted neuropsychological testing on the Plaintiff in July 2020. (ECF No. 8, pp. 570-579, 720-756). After administering several objective tests, Dr. Gess concluded Plaintiff's symptoms likely stemmed from somatoform disorder.

Plaintiff began pain management with Dr. Brian Malki on December 10, 2020. (ECF No. 8, pp. 638-642). Dr. Malki prescribed Lyrica and Nortriptyline and ordered MRIs of the spine and brain as well as nerve conduction studies. He also opined that she might benefit from physical therapy. When Plaintiff returned on January 5, 2021, reporting her pain as a 6 on a 10-point scale, Dr. Malki advised her to continue her current medications and added Robaxin. (ECF No. 8, pp. 634-637). Due to increased shoulder pain in March, he administered a trigger point injection into the right trapezius muscle. (ECF No. 8, pp. 629-634).

Plaintiff reported tingling in her left third and fourth fingers in June 2021. (ECF No. 8, pp. 649-650, ECF No. 8-1, pp. 28-31). Dr. Woodruff referred her to neurology for further evaluation. Four months later, Dr. Woodruff's Advance Practice Nurse, Jess Jordan, treated the Plaintiff for knee pain and swelling after her knee popped. The nurse documented a limited ROM and tenderness in the left medial aspect of the knee with mild laxity and a positive McMurray test. (ECF No. 8-1, pp.20-24, 47). However, x-rays showed no abnormality. APN Jordan diagnosed a sprain of the left medial collateral ligament of the knee and prescribed a hinged knee brace, Naproxen, and Tramadol. She also ordered an MRI of the left knee, which ultimately showed mild OA in the medial compartment with a displaced medial meniscus, mild mucoid degeneration, and slight chondromalacia. (ECF No. 8, pp. 743, ECF No. 8-1, pp. 46).

On December 9, 2021, orthopedist, Dr. Rolando Cheng, examined the Plaintiff, noting pain with flexion and extension of the left knee and a lot of crepitation. (ECF No. 8, pp. 737-739, ECF No. 8-1, pp. 45, 81-82). After diagnosing a torn meniscus and degenerative arthritis of the left knee, he scheduled an arthroscopy of her left knee.

Due to lower back pain radiating into her spine, Plaintiff presented in the emergency room ("ER") on January 1, 2022. (ECF No. 8-1, pp. 41-43, 69-72, 90-98). X-rays of her lumbar spine

revealed minimal facet degenerative changes at the L5-S1 level. She received Norflex (muscle relaxer) and Ketorolac (NSAID) injections and was prescribed Cyclobenzaprine (muscle relaxer).

Plaintiff underwent an arthroscopy of her left knee with an unsuccessful attempt at shaving and ablating the lateral meniscus on January 5, 2022. (ECF No. 8, pp. 742; ECF No. 8-1, pp. 68). Dr. Cheng ultimately diagnosed arthritis and recommended conservative treatment. (ECF No. 8, pp. 740-741).

In February, neurologist, Dr. Syed Ali, evaluated her for worsening pain radiating from the knuckles to the tips of her fingers on her left hand. (ECF No. 8-1, pp. 3-5). Dr. Ali prescribed a carpal tunnel brace and noted that an orthopedic referral for injections might be necessary.

On March 24, she complained of left shoulder pain. (ECF No. 8-1, pp. 66, 109-111, 117). An exam demonstrated tenderness in the left anterior subacromial area and mild crepitus with extension and backward flexion, but x-rays showed no definite acute bony abnormality. However, the acromioclavicular ("AC") joint was not ideally visible on the images. Accordingly, APN Jordan ordered an MRI of the upper extremities, which showed mild degenerative joint findings of the AC joint with some signal in the superior labrum concerning for a superior labral tear. (ECF No. 8-1, pp. 65, 116, 708).

During a follow-up with Dr. Cheng on January 10, 2023, the Plaintiff reported continued left knee pain. (ECF No. 8-1, pp. 783-784). And, on February 24, she advised APN Jordan that she had lost her balance, tripped, fell, and struck her head several days earlier. (ECF No. 8-1, p. 780). The following morning, she awoke with a headache, slurred speech, nausea, and difficulty walking. Nurse Jordan diagnosed a closed head injury.

An MRI of her upper extremities conducted in March 2023 confirmed findings suspicious for a superior labrum tear and degeneration in the AC joint. (ECF No. 8-1, p. 116).

9

Thus, contrary to the ALJ's RFC determination, the evidence supports a finding that Plaintiff's spinal, knee, and shoulder impairments, whether they be from fibromyalgia, chronic pain syndrome, or somatoform disorder, would affect her ability to stand and walk as well as perform other postural activities, to include kneeling, stooping, bending, crouching, crawling, balancing, and reaching. Because the RFC determination fails to account for all these restrictions, remand is necessary to allow the ALJ to reconsider the Plaintiff's RFC. Further, given the absence of a consultative physical exam dated during the relevant period, on remand, one is strongly advised to assist the ALJ in determining Plaintiff's precise limitations.

## V. Conclusion

Based on the foregoing, it is recommended that the Commissioner's decision be reversed, and the case remanded back to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of October 2024.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE